[Civ. No. 10724. First Appellate District, Division One.—September 7, 1939.]

ANNA SHERMAN, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Arthur B. Dunne and Dunne & Dunne for Appellant.

Clifton Hildebrand and Goodman & Brownstone for Respondent.

WARD, J.—This is an appeal by defendant from a judgment in favor of plaintiff as administratrix of the estate of

Buel M. Sherman, deceased, for the death of her husband. The action was prosecuted under the authority of the Federal Employers' Liability Act (45 U. S. C. A. 51) and specifically arose from an alleged violation of the Federal Boiler Inspection Act (45 U. S. C. A. 23).

Sherman was regularly employed by the appellant company as a "herder" to supervise the removal of engines from a roundhouse located at Watsonville Junction in this state, and the attachment of such engines to cars. Prior to the happening of the accident the engine in question had been removed from the roundhouse and was backed through the yard to a point where Sherman had been manipulating a switch. This point is approximately 100 yards from a road crossing the track upon which the engine was backing. As the engine approached, Sherman mounted the footboard on the engineer's side and gave a "back-up" signal. The engine had moved fifty or sixty feet when Sherman was seen lying alongside the tracks. His torso had been crushed, both legs and one arm had been severed and he had received other injuries as the result of which he died about an hour and a half later. He was conscious up to five minutes prior to his death.

In compliance with the Safety Appliance Act, the rear coupler on the engine in question was operated by a "cutting lever", located above the footboard upon which Sherman had mounted, the purpose of which was to permit the coupling and uncoupling of cars without the necessity of the herder or other workman going between the cars. This lever was held in place by a bracket or ring in which it revolves as the handle is lifted. The lever and bracket were not designed as hand-holds; ordinary hand-holds being provided. After the accident the bracket was found broken, and Sherman, prior to his death, stated that the reason he fell was that the cutting lever broke.

One of the cars of the train to be attached to the engine upon which Sherman was killed contained three shipments; to the National Dollar Store, Woolworth and James Nelson, respectively, all in Salinas, California. The first-named shipment, consolidated with other shipments, had been sent by Acme Fast Freight, Inc., hereinafter referred to as the Acme Company, from an eastern point outside of the state and had been delivered to the Acme agent at Oakland, California,

where it was redelivered to the Pacific Motor Transport Company, hereinafter referred to as the Pacific Company, for dispatch to the final point of destination at Salinas. The latter company received the freight from the Acme Company as shipper and consignor and issued its bill of lading to the National Dollar Store, as consignee. The Woolworth and Nelson shipments were dealt with in a similar fashion except that the Universal Car Loading & Distributing Company, hereinafter referred to as the Universal Company, was the consignor, and the Woolworth and James Nelson companies the respective consignees. The last two shipments were delivered to the Universal Company on its spur track and redelivered to the Pacific Company for shipment to Salinas. The business of the Acme and the Universal companies was that of collecting articles of freight and consolidating them into a single shipment so as to take advantage of the rates allowed for carload lot shipments. The Pacific Company furnished a door-to-door service.

An agreement existed between appellant and the Pacific Company whereby appellant granted to such company from time to time such transportation and other facilities, and the services of employees, as might be mutually agreed upon. Appellant supplied all office stationery except that bearing the name of the Pacific Company. It was agreed that the Pacific Company's rates applying to movements over appellant lines would not be published without the concurrence of appellant. The contract provided, also, that appellant was acting ''solely as a bridge carrier in a private capacity, . . . performing a physical service'' for the Pacific Company ''and not for the shipper or receiver of the commodities handled''. The Pacific Company paid as compensation for the facilities furnished, the services of employees and other rights and privileges, ninety-nine per cent of the ''income for division''. The appellant was acting under this contract at the time of the accident.

Respondent refers to the Pacific Company as the *alter ego* of appellant. Assuming that the two corporations to some extent had common officers, etc., the record does not definitely establish the corporate unity of the two corporations. (*Hollywood Cleaning & P. Co.* v. *Hollywood L. Service,* 217 Cal. 124 [17 Pac. (2d) 708].)

The trial court ruled that appellant was acting as a common carrier in interstate commerce and that decedent was employed in such commerce. There can be no recovery in this action in accordance with the provisions of the Federal Employers' Liability Act unless at the time of the accident appellant as a common carrier for hire and decedent as an employee thereof were both engaged in interstate commerce. That deceased was employed by appellant is not disputed. Except upon rare occasions, the business of appellant was that of common carrier for hire. In the present instance it acted through its railroad facilities in transporting the goods in question by train, which operated from Watsonville Junction to Salinas. The engine through which Sherman received the injuries resulting in his death was used as a means of assistance in the movement of such train. ■ The fact that appellant had agreed with the Pacific Company to act as a "bridge carrier in a private capacity" relates to the obligations and liabilities pertaining to the merchandise transported as between the contracting parties and cannot thereby affect the legal rights of those who are not parties to the private contract (*Zenz* v. *Industrial Acc. Com.*, 176 Cal. 304 [168 Pac. 364, L. R. A. 1918D, 423]), nor abrogate the rights of employees to a benefit bestowed by statutory enactment (45 U. S. C. A. 51). ■ Whether appellant was the principal or the agent in the transportation of the merchandise from Oakland to Salinas, it was nevertheless a common carrier under the Employers' Liability Act if such federal statute was applicable to the relationship of appellant and decedent, which brings us to the consideration of the real issue upon this subject, namely, whether the appellant and decedent were rendering local or interstate service.

Appellant contends that upon arrival in Oakland the bulk of the shipment was broken and that it was handled by the forwarders in the course of their business; that the service thus rendered was a local service, in the course of a local movement; that notwithstanding the movement was from a point in the east to Salinas, the journey was so interrupted at Oakland, and the shipment so "broken up" that its continuation was a new and distinctly intrastate movement; that the only outstanding contract of transportation was performed by delivery at Oakland, and further movement was

independent and local; that in making the shipment the freight forwarders are treated as the owners of the goods, and when a shipment is offered by a freight forwarder, the carrier cannot inquire who owns the goods, nor does it matter from whence they came; that it is of no consequence whether the contents of the shipment are subjects of an interstate business conducted by the freight forwarder—the only question is the character of the service being performed by the freight carrier. Here appellant contends the goods were carried for the Pacific Company, a local concern engaged in local business; that all appellant agreed to do was haul the car containing whatever the Pacific Company might have loaded into the car on its journey from Oakland to Salinas; that it was ignorant of the point of origin of the contents of the car, or the purpose and intent of the consignor of the shipment.

If appellant was engaged in interstate transportation of merchandise at the time of the occurrence of the accident, it may be conceded that the decedent employee, under the facts of this case, was likewise working toward the consummation of the transportation of merchandise from one state to its destination in another and hence working on an interstate commerce undertaking. If the transportation was interstate for the purpose of traffic in trade, it may be classified as interstate commerce. (*Adair* v. *United States,* 208 U. S. 161 [28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764].) If the merchandise transportation was entirely within the territorial confines of California, it was intrastate commerce, and the Federal Employers' Liability Act was not applicable. The precise question for solution is whether appellant in hauling the identified shipments through Watsonville Junction to Salinas was rendering local or interstate transportation service. This question may be determined by the essential nature of the transportation.

Generally recognized and accepted commercial methods, the subject and the purpose of transportation and the weight to be given to all the surrounding circumstances determine whether the Federal Employers' Liability Act applies. (*Public Utilities Com.* v. *Landon,* 249 U. S. 236 [39 Sup. Ct. 268, 63 L. Ed. 577]; *Atlantic C. L. R. Co.* v. *Standard Oil Co.,* 275 U. S. 257 [48 Sup. Ct. 107, 72 L. Ed. 270].) In *Cott* v. *Erie R. R. Co.,* 231 N. Y. 67 [131 N. E. 737, 738], the

court, in referring to the character of the transaction, said: "Its character is determined by continuity of movement combined with unity of plan." The plan or purpose of the original shippers and of all the forwarding and carrier companies was to transport the merchandise in question from a point outside of the state to Salinas, within this state. The merchandise was removed en route only by change of engines or to be placed in a different housing or storage car. No evidence appears in the record to indicate that in any removal the purpose of the shipper was disjoined from the primary purpose of transportation from the east to Salinas. The merchandise was in course of transit and any stoppage or removal was incidental to its continuous transit. (*Philadelphia & Reading Ry. Co.* v. *Hancock,* 253 U. S. 284 [40 Sup. Ct. 512, 64 L. Ed. 907].) Service by one of several transportation carriers may be wholly within one state and still be a part of interstate transportation. Such company might be liable for local and not federal taxes and still, as a cog or step in continuous transportation through or in a state, be performing transportation of an interstate character. A movement from the point of origin to the place of ultimate destination may be so interrupted that from the point of interruption a new and local service is obtained. (*State of New York ex rel. Penn. R. R. Co.* v. *Knight,* 192 U. S. 21 [24 Sup. Ct. 202, 48 L. Ed. 325], citing *Coe* v. *Town of Errol,* 116 U. S. 517 [6 Sup. Ct. 475, 29 L. Ed. 715] ; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82 [23 Sup. Ct. 266, 47 L. Ed. 394] ; *Chicago, M. & St. P. R. Co.* v. *Iowa,* 233 U. S. 334 [34 Sup. Ct. 592, 58 L. Ed. 988].)

It is true that the general freight forwarding business of the Acme and the Universal companies was in part intrastate (*Judson Freight Forwarding Co.* v. *Commonwealth,* 242 Mass. 47 [136 N. E. 375, 27 A. L. R. 1131]), and that upon receipt of interstate merchandise at Oakland they were free to use any means or facility which discretion dictated. It may be assumed that, considered from the point of view of the freight forwarder, the movement of the merchandise from the time it left Oakland was to some extent local. However, that assumption is not necessarily controlling and may be overcome by the fact that the forwarder received the merchandise through transportation facilities from a point outside of the state and that the agreement for transportation had not been

completed; the trip was not at an end, and the ultimate point of destination, Salinas, had not been reached.

As stated, the purpose of the shipper is a circumstance to be considered, but other facts must be examined and weighed to determine the character of the transportation. The preconceived intention was the performance of transportation from a point outside of the state to an ultimate destination. The essential nature of the transportation in this case was a through movement to a point beyond Oakland, namely, Salinas. To change the character of the transportation by a mere change in the name of the consignor, consignee or the carrier, or the means of traffic, would be an evasion of the spirit and the provisions of the Federal Employers' Liability Act; a coloring of the essential nature of the transportation by misleading designations. In *Buckingham Transp. Co. of Colo., Inc.,* v. *Black Hills Transp. Co.,* (S. D.) 281 N. W. 94, 96, the court said: "If it be admitted, as it must be, that the owners and the forwarder adopt this method or system of dealing in order to secure the advantage of the pool car rate, it does not follow that the unity of the transportation from the point of origin to the point of ultimate destination is broken. If that which is done is in performance of a preconceived and pre-announced intention to move property to the selected destinations, the essential continuity or unity of transportation will not be destroyed by a multiplication of carriers and contracts, by changes in form or mode of transportation, by a re-billing or a re-shipping, or by any cessation of movement incidental to a mere change in form or mode of transportation. (*Hughes Bros. Timber Co.* v. *Minnesota* (272 U. S. 469 [47 Sup. Ct. 170, 71 L. Ed. 359]); *Baltimore & O. S. W. Railroad Co.* v. *Settle* (260 U. S. 166 [43 Sup. Ct. 28, 67 L. Ed. 189]); *Western Oil Refining Co.* v. *Lipscomb* (244 U. S. 346 [37 Sup. Ct. 623, 61 L. Ed. 1181]); and *Cott* v. *Erie Railway Co., et al., supra.*) " When a common carrier casually and indiscriminately accepts merchandise for interstate transportation, the knowledge of the carrier as to the particular contents of the car transported is unimportant. (*Cott* v. *Erie Railroad Co., supra.*)

From a study of the facts, aided by the comprehensive briefs of appellant and respondent, we believe the greater weight of well considered precedents establishes a logical and

just conclusion that respondent proved by evidence overcoming any presumption to the contrary (*Johnson* v. *Southern Pac. Co.*, 199 Cal. 126 [248 Pac. 501, 49 A. L. R. 1323]) that appellant and decedent at the time of the accident (*Shanks* v. *Delaware etc. R. R. Co.*, 239 U. S. 556 [36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797]) were engaged in the interstate transportation of "things in commerce" (*Chicago etc. Ry. Co.* v. *Bolle*, 284 U. S. 74 [52 Sup. Ct. 59, 76 L. Ed. 173]), and that the trial court did not err in respect to the admission of evidence or in the denial of the motion for a directed verdict in so far as this point is concerned, nor in the instructions wherein the court informed the jurors that the Federal Employers' Liability Act applied as a matter of law.

 The device which caused the injury resulting in death was a bracket holding in place the cutting lever of a coupler, the purpose of which mechanism was to permit the opening of the knuckle of the coupler. Appellant contends that the violation of a safety statute to constitute negligence can be claimed only when the defective device causing injury is being used for the purpose for which it was designed or customarily used. It further contends in this regard that plaintiff had the burden of proving that Sherman at the time he was injured was using the cutting lever for the purpose for which it was designed—to open the coupler—and that plaintiff did not sustain this burden of proof; that the only evidence is circumstantial, and an inference of liability can be drawn from circumstantial evidence only where this is the only reasonable inference to be drawn therefrom; that Sherman was using the cutting lever as a hand-hold, which was not customary or the purpose for which it was designed; that within the few seconds after he boarded the engine it was his first duty to see that the locomotive could pass over the road crossing in safety; that he was faced ahead, and that in the interim of getting on the footboard and his fall, he could not have observed the switches, the crossing and still have turned and reached for the cutting lever.

When it is necessary to determine from circumstantial evidence the cause, the way or the means by which an accident occurred, any inference so drawn must be a reasonable one, based upon the evidence presented. In this case there is no uncertainty about the fact that the bracket holding the cutting lever gave way when decedent took hold of it, and that

he fell as a result. Any inference that he fell when mounting the footboard was reasonably dispelled when it appeared in evidence, from decedent's own statement just before he died, that the lever broke and "that is the reason I fell". This evidence is corroborated by the inference reasonably drawn from the undenied fact that after the accident the bracket was found broken.

The issue of negligence in this case is specific, namely, whether a statute had been violated. (*Atchison etc. Ry. Co.* v. *Scarlett*, 300 U. S. 471 [57 Sup. Ct. 541, 81 L. Ed. 748].) It was necessary to prove by substantial evidence that the appliance failed in the purpose for which it was designed. (*Edgington* v. *Southern Pac. Co.*, 12 Cal. App. (2d) 200 [55 Pac. (2d) 553]; *Chicago B. & Q. R. Co.* v. *Kelley*, 74 Fed. (2d) 80.) This substantial evidence might well be the reasonable inference drawn from the implied findings of the jury of the proven facts, which overcame any conjectural inference or mere guess.

▇ When no conflict in the evidence appears, but there may be a conflict as to the inferences that may be drawn from such evidence, unless the inferences that sustain the verdict are conjectural, appellate courts will not interfere. The test is whether or not the inferences which may be drawn from the evidence to sustain the verdict are reasonable. (*Pennsylvania R. Co.* v. *Chamberlain*, 288 U. S. 333 [53 Sup. Ct. 391, 77 L. Ed. 819]; *Prichard* v. *Southern Pac. Co.*, 9 Cal. App. (2d) 701 [51 Pac. (2d) 426].) The court correctly instructed upon this subject. The evidence is sufficient to sustain the implied finding that the cutting lever broke when used for the purpose for which it was designed and was customarily used.

▇ The jury returned a verdict in the sum of $25,000. In support of the claim of excessive damages, appellant contends that decedent at the time of his death had a life expectancy of 12.26 years and that his earnings averaged $155.05 per month, in addition to which he earned from $250 to $300 a year in the operation of a small commercial garden. Of his total earnings there was evidence that Sherman retained for his own personal needs approximately $150 a year and that the balance went into the maintenance of his household. From appellant's figures, the value of future contributions

lost to the respondent by reason of her husband's death approximated less than $12,000. Respondent, on the other hand, in fixing an arbitrary rate of interest, approximates the amount to be in excess of that fixed by the jury. The sum of $10,000, as prayed for in the complaint, may be considered in the computation as the maximum amount recoverable for the conscious pain and suffering of the decedent. (45 U. S. C. A. 59.) In passing, it may be well to note that, in accordance with the history of the injury, the amount is not disproportionate to verdicts under similar facts and conditions. A fair computation upon the evidence presented relative to the earnings and receipts of decedent, and his family contributions, places the amount at a figure in excess of $15,000, which, added to the $10,000 prayed for in the complaint for suffering and pain, indicates that there was no passion, prejudice or undue influence in the minds of the jurors. (*Karberg* v. *Southern Pac. Co.*, 10 Cal. App. (2d) 234 [52 Pac. (2d) 285]; *Day* v. *General Petroleum Corp.*, 32 Cal. App. (2d) 220 [89 Pac. (2d) 718].)

The judgment is affirmed.

Peters, P. J., and Knight, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 6, 1939.