[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action commenced by writ returnable to the court on March 14, 1995. The plaintiff, John F. Fitzpatrick, Jr., claims that his marriage with Rosemary D. Fitzpatrick has broken down irretrievably, seeks by way of relief a legal separation, an assignment out of the estate of the defendant pursuant toConnecticut General Statutes § 46b-81 and further equitable and legal relief. The defendant, Rosemary D. Fitzpatrick, admits the allegations of the complaint and cross-claims, seeking a dissolution of marriage, an equitable division of the estate of the parties, alimony, counsel fees, the return of the use of her birth name and further equitable and legal relief. CT Page 12266
A trial was held on the merits of this action. At trial, the defendant abandoned her claim for counsel fees or the restoration of her birth name. The only witnesses at trial were the parties. Various exhibits were introduced into evidence by the parties. In making the finding and orders herein, the court has carefully considered all of the evidence and the statutory criteria regarding a dissolution of marriage, alimony (CGS § 46b-82) and assignment of property (CGS § 46b-81). The court will note that, as to certain of the statutory criteria, little if no direct evidence was adduced at trial, which will be clear from these findings.
The parties were married on October 22, 1969, essentially 28 years ago. They have been separated just over two and one-half years. There have been pendente lite alimony orders in place since April 5, 1995, retroactive to March 20, 1995. The parties had one child born during the marriage, who is now an adult. There are no minor children born to the wife since the date of the marriage. The parties have not been the recipients of public assistance. One party has lived in the State of Connecticut for one year prior to the commencement of this action. The court finds that it has jurisdiction over the marriage between the parties.
The plaintiff's age was not testified to at trial. The court discerns from the evidence, his service in the military in Vietnam, his six years with Sikorsky, ten years with Amtrak and thirteen years since a certain accident in 1984 when employed at Amtrak, that he is between 49 and 54 years of age. His physical appearance supports that finding. No evidence was introduced as to the plaintiff's education. His employment history discloses that while serving in the military he was a helicopter crew chief. He also worked at Sikorsky Aircraft on the flying crane crew. In his years at Amtrak he was employed as a conductor. The court received no evidence as to what his earnings were as a conductor. In 1984, while employed at Amtrak, he was injured in what was described throughout the trial as a "train wreck." His injuries, as described by Mr. Fitzpatrick, were an injury to his head which caused his eyeball to flutter, and a shattered hip which over time got better. Mr. Fitzpatrick testified that at or about 1995 he also had a sleep disorder and was using a respirator. The source of these problems and whether they have resolved was not presented to the court. Finally, Mr. Fitzpatrick testified that he has diabetes for which he takes six pills per day which cost him $155 per month. CT Page 12267
After Mr. Fitzpatrick's accident in 1984, he has had two different jobs: in the parts department of Marsh Motors and as a bouncer working nightly at Toad's Place. He worked five years at Marsh Motors. He found the work at these two establishments too much. He believes that he can work but is "leery" of doing so. Currently, Mr. Fitzpatrick does errands for people, including two different attorneys in the Greater New Haven area. It was stated at the commencement of the proceeding that Attorney Michael Cahill is Mr. Fitzpatrick's Conservator; he was previously appointed guardian ad litem in these proceedings.
No further evidence was introduced as to the nature or extent of Mr. Fitzpatrick's injuries from the "train wreck", the disabilities that he is left with, or his ability to work at meaningful endeavors. Economically, there is no pressing need for Mr. Fitzpatrick to seek employment. Mr. Fitzpatrick made claim against the National Railroad Passenger Corporation (Amtrak) for damages resulting from his injuries in the "train wreck." On or about June 26, 1986, the plaintiff entered into a Settlement Agreement (Exhibit A) which provides for the following schedule of payments to him:
(a) lump sum of $850,000;
 (b) from 8/1/86 — 7/31/91 $5,000 monthly, from 8/1/91 — 7/31/96 $6,000 monthly, from 8/1/96 — 7/31/01 $7,000 monthly, all of the above payments guaranteed to Mr. Fitzpatrick and, if he shall die to his estate. If Mr. Fitzpatrick should continue to survive then, during his lifetime, the payments continue as follows: from 8/1/01 — 7/31/06 $8,000 monthly, from 8/1/06 — 7/31/11 $9,000 monthly, from 8/1/11 — 7/31/16 $10,000 monthly, and from 8/1/16, until his death, $15,000 monthly.
By the agreement, periodic payments are funded through an annuity purchased by Amtrak from Manufacturers' Life Insurance Company. Mr. Fitzpatrick, in addition to the $7,000 he currently receives monthly from the settlement, is also a recipient of Social Security income in the amount of $203 per week. He pays no taxes on his income. Therefore his gross income of $1,818 per week is also his net weekly income. His income is currently $94,536 annually. CT Page 12268
The court received no evidence as to the age or education of Ms. Fitzpatrick. By considering the length of the marriage and her demeanor, the court would estimate her age to be between 46 and 50 years of age. She has worked for the last ten years at Bob's Stores, as a cashier. Her earnings are in the range of $10.60 per hour. She works 15-20 hours per week. She has health insurance through her employment. There is no reason presented in the evidence as to why Ms. Fitzpatrick would be unable to work more hours at Bob's or similar employment.
Ms. Fitzpatrick was throughout the years of the marriage a homemaker and the principal parent to the parties' son as he grew up. Mr. Fitzpatrick was not an interested parent, participating only minimally in the activities of the child's upbringing. While he was the principal wage earner for the family, he would often spend much of his paycheck on drinking and treating his friends. This was a constant cause of tension in the parties' marriage.
The parties purchased the real property at 125 Magee Drive, Hamden for $95,000 in 1984, two months before Mr. Fitzpatrick's accident. The parties put $60,000 down toward the purchase price. Of this sum, $20,000 was from money of the marriage and $40,000 was a gift from Mrs. Fitzpatrick's parents.
The balance of the assets currently owned by the parties, as shown on their respective financial affidavits are a 1985 Corvette automobile, a 1990 Harley Davidson motorcycle, a 1997 Nissan (?) Celica, miscellaneous furniture, clothing, tools, workbenches and a red ruby glass collection. In regard to the motor vehicles, the court accepts the values listed on the financial affidavits. Mrs. Fitzpatrick also has some jewelry. The parties each have a checking account with nominal balances. Despite speculative testimony, the court cannot find that Mr. Fitzpatrick has access to or control over any bank accounts from his deceased mother. Mr. Fitzpatrick, as a veteran is entitled to a veteran's exemption from a portion of the assessment on certain real property. He transferred his VA exemption from the Hamden real estate to real property in Orange. The Orange property is Mr. Fitzpatrick's parents' home. Since separation, Mr. Fitzpatrick has resided at that property. Upon cross-examination, Mr. Fitzpatrick has denied any ownership interest in the property notwithstanding his assertion of the transfer of the application of his VA exemption to the assessment. Mr. Fitzpatrick claim to the exemption on the Orange property is governed by Conn. GeneralStatutes § 12-81: CT Page 12269
 "The following described property shall be exempt from taxation: (19) [Subject to the provisions of sections 12-89, 12-90 and 12-95,] property to the amount of one thousand dollars belonging to, or held in trust for any resident of this state who has served . . . or lacking said amount of property in his own name, so much belonging to, or held in trust for, his spouse, who is domiciled with him, as is necessary to equal said amount; . . . ."
While the Hamden property was initially held jointly, it was ultimately deeded over entirely to Mrs. Fitzpatrick by her husband. This was done during a period of time after the "train wreck" in which the plaintiff was uninsured and driving a motor vehicle. He chose not to allow the VA exemption remain on the Hamden property as he might have for a spouse. In order to place it on the real property in Orange, that property must either be held in his name or held in trust for him. Neither was disclosed at the time of trial.
In regard to indebtedness, the defendant's liabilities are as disclosed on her financial affidavit. They have, at $11,559, remained fairly constant throughout these proceedings. The plaintiff's indebtedness is only for counsel fees to Messrs. Cohen and Cahill associated with these proceedings.
Mr. Fitzpatrick throughout this long marriage physically assaulted his wife. The court finds that his assaults were periodic and continuous from the first year of the parties' marriage until their separation. He caused numerous black eyes to her. He punched her teeth in, knocking her to the floor, unconscious. He put his hands around her neck and choked her bouncing her head up and down on a bed. Only the parties' son wielding a baseball bat stopped him from continuing to choke and beat her. Mr. Fitzpatrick is unapologetic for his conduct. He displayed no remorse toward his wife in word or demeanor in court.
After an incident of abuse during their marriage, Mr. Fitzpatrick would state an apology and he would buy his wife gifts. Now, before this court he outrageously wants financial recognition taking into account the value of those gifts, particularly jewelry. Ms. Fitzpatrick quietly and docilely, year after year withstood the violence, staying with her husband silent as to her pain and injuries, with the devotion she felt proper of a wife. It is Mr. Fitzpatrick's filing of this action CT Page 12270 that provoked her request for the court to order a dissolution of their marriage. The court finds that this marriage broke down over the many years as a result of Mr. Fitzpatrick's violence wrought upon his wife.
The plaintiff makes claim that the annuity income resulting from the settlement of his personal injury claim against Amtrak (his then employer) should not be considered as an asset subject to division under Connecticut General Statutes § 46b-81 nor as income. The claim by the plaintiff essentially is (1) that it could not be income because it continues after his death, and (2) while he asserts it to be an asset, it's not subject to division because it's asserted to compensate him for his personal pain and suffering. The defendant disagrees. The defendant reminds the court that these funds are annuity payments; that there has been no allocation of any of the sums to pain and suffering, that it is income as defined (analogously) by Child Support Guidelines § 46b-215a-1(ii)(vii), and therefore, available for alimony purposes. Finally, the defendant urges the court not to analogize the payments to workers' compensation benefits, in any case. Defendant argues that these annuity payments are part of the estate of the plaintiff and available for assignment underConnecticut General Statutes § 46b-81.
The annuity payments to the plaintiff are in satisfaction of the settlement obligations of Amtrak for the claim made by the defendant against Amtrak under FELA, the Federal Employer's Liability Act, 45 U.S.C. § 51. The defendant's right to make his claim, and therefore receive the fruits of the settlement result from his status as an employee of the railroad.
 "Every common carrier by railroad while engaging in commerce . . ., shall be liable in damages to any person suffering injury while employed by such carrier in such commerce . . . ." 45 U.S.C. § 51.
The settlement of the plaintiff's claim against the railroad is "in full settlement, compromise and discharge of all claims" in the plaintiff's complaint that he brought against the railroad. (Plaintiff's Exhibit A). No allocation was made in the settlement agreement as to the value of the damages. The plaintiff urges that the sums actually represents pain and suffering particular to him. While pain and suffering may be a proper element (Sherman v. Southern Pac. Co., (1939) 93 P.2d 812,34 Cal.App.2d 490, cert. den'd. 60 S.Ct. 610, 309 U.S. 669, 84 CT Page 12271 L.Ed. 1015) of a FELA claim, there is no evidence before this court as to an allocation, if any, of the award to that aspect of the claim for damages. Similarly, loss of earnings, permanent loss of bodily functions, medical bills are all proper components of a FELA claim. None are allocated in the settlement. Before this court, simply, are the amounts paid to date and payable in the future, some absolutely and some contingent upon the plaintiff's survival.
However, this court does note recoveries under FELA are not subject to federal income taxation. Fritz v. Consolidated RailCorp., (1986) 501 N.E.2d 30, 68 N.Y.2d 877, 513 N.Y.S.2d 965.
Before this court the question whether this settlement agreement is an asset or income to be considering in the court fashioning its orders. In form, the periodic payments are funded by an annuity. While the obligation of Amtrak to pay exists regardless of the annuity funding, its obligations are satisfied pro tanto by the annuity payments.
This court concludes that the payments made pursuant to the settlement agreement are property within the meaning ofConnecticut General Statutes § 46b-81. In the matter ofKrafick v. Krafick, (1995) 234 Conn. 783, our Supreme Court embraced the definition of "property" as found in Black's Law Dictionary.
 "Black's Law Dictionary (6th Ed. 1990) defines "property" as the term "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes real and personal property, easements, franchises, and incorporeal hereditaments." Krafick at 794.
Any persons are intangible property as a kind of contractual right, so is a settlement agreement an annuity. Each is a contract and therefore is property. The courts have been instructed to interpret the term "property" broadly. Krafick at 795.
The inclusion of the Amtrak settlement agreement within the ambit of the term property in Conn. General Statutes § 46b-81
requires this court to consider it in respect to not only the CT Page 12272 property division but, also, the defendant's claim for alimony.Bartlett v. Bartlett, 220 Conn. 372, 380 (1991). In Bartlett, at p. 381, the Supreme Court noted that ". . . a court may properly consider all assets, liquid and non-liquid alike, for the purpose of fashioning the original alimony award at the time of dissolution."
Finding that the Amtrak settlement agreement is property, the court is required to value the asset. There are two parts to the periodic payments of the agreement. The first part is guaranteed: from November 1, 1997 through July 31, 2001, its payments total $315,000. The court has been provided no evidence as to the time value of money. Therefore, the court finds that the value of the first portion of the settlement agreement periodic payments is $315,000. The second portion's payments are contingent upon the plaintiff's survival. The court was neither presented evidence of the value of this portion of the settlement, nor asked to take judicial notice of any mortality tables. The amounts are specific as stated earlier herein.
As the initial payment in settlement of the plaintiff's claim against Amtrak, $800,000 was paid. The plaintiff received approximately $200,000 in net proceeds from that lump sum payment. Between $50,000 and $60,000 of that sum was used for repairs, maintenance and other improvements to the home at 125 Magee Drive, Hamden. A car was purchased for $24,000 and Mr. Fitzpatrick bought his wife a diamond ring for $3,500 (after an incidence of physical assault by him) from the money. The fund of money was administered by Carl Amento, the plaintiff's conservator (at the time) who gave permission for fund releases on request. When there was approximately $20,000 left it was released to the plaintiff. Neither party is aware of the manner of its ultimate disposition, or, other portions of the $200,000 not accounted for above.
During the pendente lite period of this matter, on April 5, 1995, the plaintiff was ordered to pay the defendant alimony in the amount of $600 per week, paid as the monthly amount of $2,580. Once each year while the matter was pending, the plaintiff failed to make the court ordered payments in a timely manner, and a further Order of Compliance was necessitated.
It should be noted that while the Guardian Ad Litem was in attendance with the plaintiff throughout the proceedings, no testimony (or report of any kind) was presented by him at the CT Page 12273 trial.
The court orders:
1. Dissolution of the marriage.
2. The defendant shall remain the sole owner of the real estate at 125 Magee Drive, Hamden, free and clear of any claim of the plaintiff.
3. The defendant shall remain the sole owner of the 1985 Chevrolet Corvette, free and clear of any claim of the plaintiff.
4. The plaintiff shall make available to the defendant all items in the family home that are made of ruby red glass, all model trains and tracks, accessories, including the boards and electrical parts, and the beer can collection. These items shall be retrieved by the defendant within 60 days with a police escort, at a time prearranged through plaintiff's counsel.
5. The plaintiff shall pay to the defendant $100 per month periodic alimony to terminate upon the death of either party. Commencing August 1, 2001, provided that he is alive, it is ordered that the plaintiff shall pay as periodic alimony to the defendant $3,500 per month. The plaintiff's periodic alimony obligation to the defendant shall not terminate on the remarriage of the defendant.
6. The plaintiff shall, as lump sum alimony, pay to the defendant $150,000, payable as follows:
$3,125 on the 25th day of each month commencing November 25, 1997, for a period of 48 months. In any month that the payment is more than three days late the plaintiff shall pay interest at the rate of 10 per cent per year. This is not meant to function as a limitation of the available to the defendant in the event of the plaintiff's failure to pay in accordance with these orders. The defendant shall not be required to declare these lump sum alimony payments as income, nor are they deductible by the plaintiff on his Federal or State Income Tax Returns.
7. The plaintiff is the sole owner of the Harley Davidson motorcycle and shall, through a third party, make arrangements to remove it from the marital home within 60 days. He shall not be present the day it is removed from the premises unless it is the CT Page 12274 same day he removes the personal belongings he is entitled to pursuant to these orders. The defendant shall sign all necessary papers to transfer ownership to the plaintiff upon presentation of them.
8. All other assets, as disclosed on the parties' financial affidavit, shall remain theirs free of any claim of the other.
9. Each party shall pay their own debts as disclosed on their respective financial affidavits.
10. As to the real property in Orange that this court has found the plaintiff has an ownership interest in, the court cannot make any finding as to value of that undisclosed interest and, accordingly makes no orders regarding the same.
Munro, J.