[Civ. No. 5655.   Third Appellate District.—April 26, 1937.]

ROSE GALIANO et al., Appellants, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Respondent.

Lowell L. Sparks and White, Miller, Needham, Harber & Mering for Appellants.

Thomas J. Straub, W. H. Spaulding, Clinton F. Stanley and T. L. Chamberlain for Respondent.

PLUMMER, J.—This cause is before us upon an appeal by the plaintiffs from a judgment entered by the court in favor of the defendant, notwithstanding a verdict in favor of the plaintiffs. The judgment was entered in favor of the defendant pursuant to the provisions of section 629 of the Code of Civil Procedure. The action was prosecuted by the plaintiffs to obtain damages for and on account of the death of Antonio Galiano, which occurred on or about the 1st day of July, 1934, alleged to have resulted from the negligence and carelessness of the defendant relative to the maintenance of a certain watercourse known as and called "Dutch Ravine Canal", owned and operated by the defendant. Antonio Galiano, theretofore being the husband of the plaintiff, Rose Galiano, and father of the minor children named in the title to this action.

Antonio Galiano came to his death at a point on the state highway a short distance east of a tunnel under a hill in the town of Newcastle. From the tunnel the highway leads in an easterly direction curving slightly to the southward across a low depression known as the "Dutch Ravine", along which is situate the canal belonging to the defendant above mentioned. The concrete portion of the highway is twenty feet wide. Along each side of the concrete highway is a macadamized strip two feet wide. On the southerly side of the highway involved in this action there is a dirt shoulder approximately fifteen feet wide. The fill constructed by the State Highway Department over the "Dutch Ravine" is approximately eleven feet in height, or that distance above the contour of the ravine. The sides of the fill are steep.

The canal belonging to the defendant was in operation long prior to the construction of the highway. In order to pass over the canal and leave no obstruction to the flow of water therein, the State Highway Department laid down under the entire width of the highway constructed as we have just stated, two galvanized iron pipes approximately forty-two inches in diameter. On the southern side of the fill it constructed a concrete bulkhead and sidewalls which would conduct the water into the pipes which we have just mentioned, without any portion of the embankment being washed away by the current of the water in the canal.

At the time Antonio Galiano met his death the water in the canal was approximately three and one-half feet in depth. While called a "culvert" in the transcripts and in the briefs, the structure just mentioned was really a conduit built for the purpose of allowing the water to flow in the canal unobstructed, and was not in the ordinary sense of the word a culvert. The entire structure was at least eleven feet below the surface of the roadway. All of the structure just mentioned was within the exterior limits of the highway, and also of the embankment or fill constructed under the supervision of the State Highway Department. There were no railings or guard-walls or markers of any kind indicating either the existence of the canal or of the bulkhead or headwalls constructed by the state at the southerly end of the two galvanized iron pipes. There were, at the time Antonio Galiano met his death, no fences or posts or markers of any kind along the southerly side of the fifteen-foot earth shoulder which we have mentioned. In other words there was first in the structure a

twenty-foot concrete slab, a two-foot macadamized shoulder, and then an earthen shoulder on the same level fifteen feet wide. At the outer edge of the earth's shoulder the fill sloped down for a distance of eleven feet. The record shows a man's foot tracks leading down from the outer edge of the earth's shoulder to the concrete bulkhead above the iron pipes which we have mentioned, indicating that the deceased in some manner went down the southerly side of the embankment to the concrete bulkhead, stepped off into space and met his death by drowning in the canal. It appears that the current carried him through one of the iron pipes down to a grating in the canal a short distance to the northward from the highway where his body was subsequently found.

The circumstances leading up to the tragedy which we have mentioned, as set forth in the transcript, show that the decedent was driving along the state highway between Newcastle and Auburn, had reached the point which we have mentioned, when by some means he came into collision with the rear of an automobile owned and driven by one Solaro. Subsequent to the collision the cars were driven to the southerly edge of the two-foot macadamized shoulder, leaving a considerable space between the car operated by the deceased and the outer edge of the dirt shoulder. This distance is alleged by the respondent to have been at least ten feet. There seems a little confusion as to the testimony in this respect by reason of a witness first having estimated the distance at somewhat less, and then corrected his statement to show that at least there was ten feet between the car driven by the deceased and the southerly edge of the dirt shoulder. Whatever the distance may have been, the testimony is clear that there was sufficient space between the car and the edge of the dirt shoulder to permit one walking back and forth with entire safety. The time of the collision between the two cars was somewhere between 9 and 10 P. M. There was no moon and the testimony indicates that the night was rather dark.

After the collision just referred to it appears that the deceased and Mr. Solaro engaged in an argument as to who was responsible, following which Mr. Solaro asked some girls who appeared to have arrived on the scene in a car not involved in the collision, to request a traffic officer to come to the scene and settle their differences. Immediately following this request made by Solaro it appears that the deceased went to his car, took out a package of some kind, not seen at

the time by any witness, moved away from the car, and was not seen thereafter until his body was found at the grating in the canal. Shortly after the incident related, a traffic officer by the name of Marvin arrived on the scene, made such investigations as he could, and finally found the body of the deceased at the grating or trash gates heretofore mentioned. Alongside of his body was also found a three-gallon keg of wine.

Considerable testimony was introduced bearing upon the question of the intoxication of the deceased at the time he caused his car to come into collision with the rear end of the car operated by Solaro, but from the view we take of the case it is immaterial whether the deceased was or was not under the influence of intoxicating liquor. The testimony would indicate, however, that the deceased knowing that a traffic officer was about to come and investigate the circumstances of the collision, had in mind concealing the three-gallon keg of wine, and in an attempt so to do, met his death by either stepping or falling off the headwall at the base of the fill and just above the iron pipes laid in the canal. Upon the state of facts just related the jury rendered a verdict in favor of the plaintiffs, but upon motion therefor, judgment was entered in favor of the defendant.

In considering the question whether the action of the trial court was well founded, we may agree with all that the appellants have said with regard to this being a nation where a jury trial is held to be a sacred right, and that in either ordering a directed verdict or granting a judgment notwithstanding a verdict the rule to be applied is much stricter than that to be followed by appellate courts when a new trial only has been granted. ▮ It is the duty of the appellate court to read the testimony most favorably for the party against whom such a directed order has been made or a judgment entered notwithstanding the verdict, and if there is any testimony which substantially would support a verdict in favor of the opposing party, the action in directing a verdict or in entering a judgment notwithstanding a verdict cannot be upheld. On the other hand, if the testimony shows as a matter of law that no reasonable conclusion is legally deducible from the evidence, other than that which compels a directed verdict or justifies the entering of a judgment notwithstanding the verdict, it is the duty of the trial judge to make the order directing a verdict or to enter such judgment as the

law requires, notwithstanding the verdict of the jury. In other words, if the one against whom the verdict is rendered, or is about to be rendered, is shown not to be legally liable, it is the bounden duty of the trial court to either take the case from the jury or to enter such judgment as the law requires.

This brings us to the decisive question: If anyone was negligent in any manner leading to the death of the deceased, other than negligence on his part, upon whom does the law fix the responsibility?

As we have shown, the deceased came to his death by passing straight down the embankment to the concrete headwall above the canal, and then, off into space. Whether he walked or fell is wholly immaterial.

In determining liability three factors are to be considered,—1st. The fact that the highway was laid out and constructed over the canal long after the canal had been in operation. 2d. The width of the highway, the character of the traveled portion thereof. 3d. The apparent peril, if any, offered to the traveling public.

In the cases relied upon by the appellants, with the exception of one or two, the peril complained of was attendant upon the use of the highway *as* a highway, and not upon a peril outside of the portion of the highway prepared for public travel and incident to the use of the highway by the traveling public. There seems to be this distinction made in practically all of the cases, save and except where the peril exists in the nature of a trap. One of the cases relied upon by the appellants involves the doctrine applicable to structures specially attractive to children, as well as a concealed peril.

In *Gorman* v. *County of Sacramento,* 92 Cal. App. 656 [268 Pac. 1083], the dangerous condition involved in that action was directly attendant upon, and incident to the use of the highway *as* a highway. The facts show that the board of supervisors of the county of Sacramento had erected a bridge across a watercourse, and neglected to construct any railing or guards of any description whatever along the outer edge of the bridge. The deceased, whose death was alleged as the basis for damages, in that case, was a boy. While familiar with the bridge, was crossing the same at nighttime upon a bicycle, and by some means or other went over one side of the bridge into the stream below and was drowned. The facts

recited in the opinion in that case show the dangerous condition of the structure to anyone using the highway *as a highway*.

In the cases of *Gerberich* v. *Southern California Edison Co.*, 5 Cal. (2d) 46 [53 Pac. (2d) 948], and *Norton* v. *City of Pomona and Southern California Edison Co.*, 5 Cal. (2d) 54 [53 Pac. (2d) 952], the danger complained of, and which led to the injuries for which damages were sought in those cases, consisted of what we have just stated, the maintenance of a peril in the highway when used *as* a highway. It appears that persons riding in an automobile came into collision with an electric light pole which had been erected by the Southern California Edison Company at a point about four feet from the edge of the macadamized shoulder adjoining the concrete portion of the highway; that the dirt shoulder on both sides of the pole had frequently been used by the traveling public whenever the highway was congested with traffic. It was urged on behalf of the appellant, Southern California Edison Company, that the pole had been erected under permission of the city authorities, and therefore did not constitute a public nuisance. It was held, however, that the question as to whether the pole was maintained in a negligent manner, was for the jury. In all three of the cases just cited the facts show conclusively that the acts of neglect complained of constituted a continuing menace to the safety of all persons who were using the highway *as* a highway, and in no sense were departing therefrom for any personal purpose or undisclosed motive.

In the case of *Sanchez* v. *East Contra Costa Irr. Co.*, 205 Cal. 515 [271 Pac. 1060], the opinion discloses facts which readily distinguish that case from the one at bar. There, a child was injured by falling into a ditch and being carried into a concealed syphon, while the court held that so far as the open ditch or canal was concerned, the child was supposed to have had knowledge of the dangers attendant upon falling into the same, but that it could not be held as having knowledge of the syphon which appeared to have been obscured by bushes or other growth at the opening thereof. The Sanchez case has nothing to do with the use or maintenance of a highway.

In *Barrett* v. *Southern Pac. Co.*, 207 Cal. 154 [277 Pac. 481], it appears that the appellant erected a pier in the highway, under the authority of the city council, and while

the case was reversed, for other reasons, the court apparently held that the erection of the pier in the traveled portion of the highway constituted a continuing menace to the users of the highway.

The headwall of the culvert, or more properly speaking, the conduit for the passage of water under the highway, offered no peril to the use of the twenty-foot concrete strip or of the two feet of asphalt or macadamized shoulder on each side thereof, or the fifteen-foot earth shoulder on the southerly side of the highway, when used by the traveling public for highway purposes, and so long as the deceased used the same for the purposes for which the fill across the ravine, the concrete slab, asphalt or macadamized shoulder and earthen shoulder were erected, there was no menace whatever to his personal safety. It was only when he left the highway or the earthen shoulder thereof that there existed any menace to his personal security.

The three propositions which we have advanced, and are considering, are so correlated that they may properly be considered under one heading as to where the responsibility lies, if any.

The respondent advances, among other objections as to its liability, the claimed fact that the burden was upon the appellants to show that there was some necessity for the deceased going over the edge of the embankment, or that it was not an act taken in furtherance of his own pleasure (citing the cases of *Biggs* v. *City of Huntington*, 32 W. Va. 55 [9 S. E. 51], and *City of Dayton* v. *Taylors' Administrators*, 62 Ohio St. 11 [56 N. E. 480]), and suggested that the deceased's act was, as we have heretofore mentioned, for the purpose of removing from his car a concealed keg of wine, and that whether he walked off, or fell from the embankment and over the headwall heretofore mentioned, is immaterial, as he was in furtherance of his own purposes, and not in the use of the highway *as* a highway. We do not deem it necessary to discuss this question or further refer to the two cases just mentioned.

As to the liability of one who voluntarily or unnecessarily deviates from the traveled portion of a highway, and in so doing meets with an accident from some cause outside of the traveled way and cannot recover from an injury so sustained, we may cite 29 C. J., page 703.

In addition to the cases hereinafter mentioned decided prior to 1933, relative to the control and management of highways by municipalities, counties or states constructing the same, we may call attention to section 363-R of the Political Code, added in 1933, Statutes 1933, chapter 326, giving to the department of public works control of all roads and highways, etc. Thus, in this case, if any negligence whatever existed by reason of there being no barrier or marker of any kind along the southerly edge of the fill which we have mentioned, or of there being no guard-rail over the headwall and sidewalls of the concrete structure at the base of the fill, the liability, if any, must rest upon the person, municipality, county or state having charge thereof.

In the *City of Madera* v. *Madera Irr. Co.*, 159 Cal. 749 [115 Pac. 936], the Supreme Court had before it the identical question which we are now considering. It is there said (we quote from the syllabus): ''Section 551 of the Civil Code requiring the owners of canals, flumes or other appliances for conducting water, crossing or running along a public highway, to construct, maintain and keep in repair such bridges across the same as may be necessary to the safe and convenient use of the highway by the public, does not impose the duty upon such owners of constructing and maintaining bridges across the same upon the lines of streets or highways laid down and opened after the construction of the canal, flume or other appliance.'' To the same effect is the case of *South Yuba Water Co.* v. *City of Auburn*, 16 Cal. App. 775 [118 Pac. 101]. The canal maintained in this case by the defendant does not parallel the highway, but is simply a watercourse passing almost at right angles under the fill which we have mentioned, and no portion of the canal furnishes a trap or menace to the use of the highway *as* a highway, and is not exposed, save and except a short portion thereof between the southerly boundary of the highway and the entrance to the conduit under the fill.

In going down to the canal from the highway following the course indicated by the evidence as taken by the deceased, the canal could not be reached without going over the concrete headwall thereto erected and maintained by the highway department of the state of California.

In 14 American Law Reports, page 1412, we find the following: ''An erection or excavation already existing, and not otherwise unlawful, does not become unlawful when the

land to which it is immediately contiguous is dedicated to the public as a way, although it prevents the way from being as safe as it otherwise would have been. *Fisher* v. *Prowse* (1862) 2 Best & S. 770, 121 Eng. Reprint, 1258, 31 L. J. Q. B. (N. S.) 212, 8 Jur. N. S. 1208, 6 L. T. (N. S.) 711; *Robbins* v. *Jones* (1863) 15 C. B. (N. S.) 221, 143 Eng. Reprint, 768, 33 L. J. C. P. (N. S.) 1, 10 Jur. N. S. 239, 9 L. T. (N. S.) 523, 12 Week. Rep. 248.''

In *Flansburg* v. *Town of Elbridge*, 205 N. Y. 423 [98 N. E. 750, 41 L. R. A. (N. S.) 546], it is held (quoting from the syllabus) : ''The statutory liability of a town for injury caused by the neglect of its highway commissioners to keep in repair its highways and bridges, does not extend to an injury caused by failure to extend a guard for a culvert embankment outside of the traveled portion of the highway so that a traveler whose horse had wandered in the dark out of the beaten path was carried over the embankment.''

In section 349, volume 2, ''Restatement of the Law of Torts'', we find the following: ''A possessor of land over which there is a public highway or private right of way is not subject to liability for bodily harm caused to travelers upon the highway or persons lawfully using the way by his failure to use reasonable care (a) to maintain the highway or way in safe condition for their use or (b) to warn them of dangerous conditions thereon which, although not created by him, are known to him, and which they neither knew nor are likely to discover. . . . The duty to maintain a highway in a condition safe for travel is, in America, in some states by statute and in others by common law, placed upon the municipal subdivision which holds the highway open to the public for travel. This duty includes not only a duty to maintain the surface of the highway in a condition reasonably safe for travel, but also a duty of warning the traveling public of any other condition which endangers travel, whether caused by a force of nature, such as snow and ice, or by the act of third persons, such as a ditch dug in the sidewalk or cartway or an obstruction placed thereon;'' etc.

A further illustration is given in section 368 of the same volume of a possessor of land upon which there is a deep quarry and a highway is laid out and established thereafter running along the edge of the quarry. It is the duty of the municipality maintaining the highway for public travel to maintain fences or guards to protect the traveling public.

In 13 Ruling Case Law, section 311, page 381, the rule as to liability for obstructions outside of the traveled portion, but within the side lines of the highway, is thus stated: "There seems to be considerable conflict of authority as to the liability of municipal and *quasi*-municipal corporations for injuries sustained by travelers as a result of defects and obstructions within the limits of a street or highway, but outside the traveled portion thereof. They are, however, generally held to be liable for injuries resulting from such defects or obstructions which are in such proximity to, or so connected with the traveled portion of the way as to render it unsafe to those traveling thereon, or where the danger is hidden and the defect or obstruction amounts to a trap or a snare." In the same volume, section 379, we find the further statement: "The fact that a traveler goes outside the limits of the highway or that portion of it set aside for travel voluntarily, and without good cause, may amount to contributory negligence precluding recovery for resulting injury; as, for example, where he attempts to drive from one traveled track to another several feet distant therefrom without investigating the intervening ground which is not used as a road, or where he knowingly or carelessly departs from a known safeway and goes heedlessly across the street and beyond its limits and upon the land of an abutting owner and is there injured by falling over a retaining wall."

As to the duty of the authority constructing the highway over the waterways or canals subsequent to the construction of the canal or waterway to maintain the highway in a safe condition, a number of additional cases might be cited, but those to which we have referred appear to us to be conclusive.

In the Flansburg case, *supra*, it appears that the macadamized roadway was sixteen feet wide with shoulders seven feet on either side constructed of earth; that the driver of the automobile who was injured drove off the roadway across the shoulders and into a pit seven feet distant from the edge of the macadam which was there before the highway was constructed; it was held that the owner of the land was not liable.

In *McChesney* v. *Dane County*, 171 Wis. 234 [177 N. W. 12], it was held that one traveling outside of the way prepared for the public constitutes negligence as a matter of law. Practically to the same effect are the cases of *Tasker*

v. *Inhabitants of Farmingdale,* 85 Me. 523 [27 Atl. 464], and *Carey* v. *Town of Hubbardston,* 172 Mass. 106 [51 N. E. 521].

The most recent case supporting the action of the trial court in entering judgment for the respondent is that of *Otten* v. *Big Lake Ice Co.,* 198 Minn. 356, 270 N. W. 133. In that case an ice company, pursuant to plans and specifications approved by the highway department, conducted a passageway under the improved portion and traveled portion of the highway, for the purpose of passing ice thereunder. No precautionary measures were erected, or called for their erection by the plans adopted by the highway department, for guarding the passageway for ice; outside of and beyond the portion of the highway set apart for use of the traveling public. It appears that the party injured went outside of the portion of the highway set apart for use of the traveling public, and was injured by falling into the tunnel or excavation constructed for the passage of ice through and beyond the tunnel. It was held that the defendant ice company was not liable, as it was the duty of the highway department to take all precautionary measures necessary to protect the traveling public from harm. The circumstances attendant upon this case which we have set forth herein, and the cases which we have cited, we think establish conclusively that if any duty existed upon the part of anyone to place a guardrail along the southerly bank of the fill across the ravine or along the head or sidewalls of the conduit at the base of the fill, that duty rested upon the state of California or the State Highway Department thereof, and not upon the defendant, and therefore, if any neglect has resulted in the death of Antonio Galiano, it is chargeable not to the defendant, but to the state of California or the State Highway Department thereof, against which this action is not prosecuted.

What we have said as to the liability of a municipality, highway department, or state constructing a highway over a waterway already in existence, has only been necessary in order to establish the nonnegligence on the part of the respondent and the correctness of the act of the trial court in entering judgment in favor of the respondent notwithstanding the verdict of the jury, and is not to be interpreted as an expression of an opinion by the court that under the circumstances disclosed in this case, negligence is shown on

the part of anyone having to do with the construction or maintenance of the highway involved herein.

It is also evident from what we have said in the foregoing that whether the deceased Antonio Galiano was or was not presumed to have taken due care for his own safety, does not affect the liability of the defendant in this action, and, therefore, that question is not discussed herein.

The judgment is affirmed.

Thompson, Acting P. J., concurred.

Deeming himself disqualified, Judge Held did not participate in the decision in this case.