[L. A. No. 21405. In Bank. Dec. 27, 1950.]

OTTIE GILLESPIE et al., Respondents, v. CITY OF LOS ANGELES, Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, Victor P. Spero, James A. Doherty and Leonard G. Husar, Deputy City Attorneys, for Appellant.

C. R. Montgomery and Robert E. Reed as Amici Curiae for Appellant.

Ben C. Cohen, Leo Shapiro and S. S. Hahn for Respondents.

TRAYNOR, J.—Route 156 is a state highway extending from Chatsworth to Topanga Beach in Los Angeles County. From Ventura Boulevard in the city of Sherman Oaks west to the Pacific Ocean for about 20 miles through Topanga Canyon, the highway, commonly known as Topanga Canyon Road, is a twisting paved mountain road varying in width from 20 to 24 feet, with 6 to 8-foot shoulders of rock and oil or decomposed granite. About .86 of a mile of Topanga Canyon Road lies within the corporate limits of the city of Los Angeles.

On the morning of September 5, 1943, the burned wreckage of a 1933 Hupmobile sedan owned by plaintiff Ottie Gillespie was discovered at the bottom of Topanga Canyon below the part of the highway within the Los Angeles city limits, about 3.2 miles northeast of the junction of Topanga Canyon Road and the Roosevelt Highway at Topanga Beach. In the wreckage were the charred bodies of six people, from 19 to 24 years of age. There were no survivors of the accident and no eyewitnesses thereto.

Plaintiffs, surviving relatives of the victims of the accident, brought this action for wrongful death in the Superior Court of Los Angeles County, joining as defendants the city of Los Angeles and the State of California. The complaint alleged that the accident was caused by defendants' negligence in the

design, construction, and maintenance of the highway, in that "said highway is so laid out and constructed as to make it appear that the same is straight and continuous at said point [at which the automobile presumably left the road] when in fact the same prescribes a horseshoe turn or curve, swinging sharply inward and returning to a line approximately even with the line of said highway immediately prior to said abrupt turn . . . the distance from said highway at said point to the bottom of said embankment being more than 150 feet . . . that there were and are no lights, blinkers, or warning signals of any kind or character at the approach to said curve to indicate or disclose the existence thereof . . . that there were and are no fences, guard rails, barriers, barricades or embankments or other safety devices around said curve or the approach thereto to apprise persons of the fact that the said highway curves at said point and does not continue in a straight direction . . . that at said time and place and as a direct and proximate result of the said dangerous and defective condition as aforesaid, the said automobile . . . went off the highway and fell to the bottom of the embankment, at said point a distance of more than 150 feet.'' It is plaintiffs' theory that by reason of the alleged negligence of the city and the state in failing to warn approaching drivers of the existence of the curve, the driver of the automobile, while exercising due care for his own safety and that of his passengers, drove straight ahead on the road, not knowing that it curved sharply inward, and plunged off the road to the bottom of the canyon. On the state's motion, a change of venue to Sacramento County was granted. The trial court there sustained the state's objection to the introduction of any testimony and the action was dismissed against the state on the ground that the suit was one against it in its sovereign capacity to which it had not consented. Plaintiffs' motion for retransfer to Los Angeles County for convenience of witnesses was granted. The cause proceeded to trial before a jury against the city, and the jury returned verdicts for plaintiffs aggregating $110,000. The city appeals from the judgments entered thereon.

The city's principal contention is that it was not legally responsible for the condition of the state highway where the accident occurred because it had no control over, or authority with respect to, the maintenance of the highway. Plaintiffs contend, however, that under the provisions of the Public Liability Act of 1923 (2 Deering's Gen. Laws, Act 5619, now

Gov. Code, § 53051) the city is liable for dangerous or defective conditions in a highway whether or not it has control over it, and that in any event it had enough control over the highway in question to remedy the condition had it so wished.

The Public Liability Act of 1923 provides:

"Counties, municipalities and school districts shall be liable for injuries to persons and property resulting from the dangerous or defective condition of public streets, highways, buildings, grounds, works and property in all cases *where the governing or managing board of such county, municipality, school district, or other board, officer or person having authority to remedy such condition,* had knowledge or notice of the defective or dangerous condition . . . and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition." (Italics added.)

Although it is clear from the wording of the statute that a city cannot be liable for a dangerous or defective condition of a public street or highway unless it has authority to remedy the condition, plaintiffs contend that the cases of *Shea* v. *City of San Bernardino,* 7 Cal.2d 688 [62 P.2d 365], *Bosqui* v. *City of San Bernardino,* 2 Cal.2d 747 [43 P.2d 547], and *Rose* v. *County of Orange,* 94 Cal.App.2d 688 [211 P.2d 45], establish the rule that even if a municipality is without power to correct a dangerous or defective condition, it is under a duty to warn of its existence or request those with the necessary authority to remedy it. We cannot agree with this contention.

In the Bosqui case a viaduct that was part of the system of city streets was allowed to fall into disrepair. The city contended that under an order of the railroad commission, the utility operating the railroad over which the viaduct passed had the sole duty of repair. Far from holding that the city's authority to remedy the condition was not a necessary prerequisite to liability under the Public Liability Act, the court took care to note that the order of the commission did not deprive the city of control over the viaduct or relieve it of its duty to remedy the condition.

In the Shea case a city street crossed a railroad track. The city contended that the dangerous condition was caused by the elevation of the rails, over which the railroad commission

had exclusive jurisdiction. The court held that the city was under a duty to request the commission to correct the condition or to warn the public of the danger.

In the Rose case a county road ran at right angles into a state highway and terminated. There was a dangerous ditch at the side of the state highway opposite the end of the county road. The court held that even though the county had no power to correct the dangerous condition bordering the state highway, it was under a duty to warn persons on the county road of the danger lying at its end.

Both the Shea and the Rose cases are thus examples of situations where streets over which the city or county had control were made dangerous by conditions that the local governments could not control. In both cases, however, the city or county had authority at least to warn of the dangers. They had control over their own highways and authority therefore to post warnings along those highways of the dangers created by conditions contiguous thereto.

In the present case, however, the condition of the highway did not make a city street dangerous. The danger lay wholly on the state highway itself. ▮ If the city had no authority to remedy the condition of the state highway where the accident occurred it cannot be liable under the terms of the Public Liability Act for failure to do so.

Section 100 of the Streets and Highways Code, in effect in 1943 at the time the accident happened, provided:

"The [state] department [of public works] shall have full possession and control of all State highways. . . . The department shall maintain any existing traversable highway which is between the termini of, and approximately on, any route included in the State highway system. . . ."

Section 27 of the same code provides in part:

"As used in the general provisions and in Divisions I and II of code, 'maintenance' includes:

"(a) The preservation and keeping of rights of way, and each type of roadway, structure, and facility, in the safe and usable condition to which it has been improved or constructed. . . .

"(b) The necessary provision for special safety conveniences and devices. . . .

"*The degree and type of maintenance* for each highway, or portion thereof, shall be determined in the discretion of the authorities charged with the maintenance thereof, taking

into consideration traffic requirements and moneys available therefor.''

Section 204 provides:

''The department shall exercise the same powers and duties with respect to State highways within cities as with respect to other State highways.''

Under these provisions the state department of public works, not the city, has authority to remedy dangerous or defective conditions on state highways within the city limits. ''The degree and type of maintenance'' including ''safety conveniences and devices'' are to be determined by the state agency. ■ It follows that the city is not liable for dangerous or defective conditions of state highways under these provisions.

■ It is contended, however, that the city has power under section 465 of the Vehicle Code to post warnings of dangerous conditions existing on state highways. That section provides:

''(a) The State Department of Public Works, Division of Highways, shall place and maintain, or cause to be placed and maintained, with respect to highways under its jurisdiction, appropriate signs and signals as required hereunder, and may respectively place and maintain, or cause to be placed and maintained, such appropriate signs and signals as may be authorized hereunder, or as may be necessary properly to indicate and to carry out the provisions of this code, or to direct or warn traffic upon the highways.

''(b) Local authorities in their respective jurisdictions shall place and maintain or cause to be placed and maintained such traffic signs and, subject to the provisions of Section 466, such stop signs, semaphores and control devices upon streets and highways as may be necessary to indicate and to carry out the provisions of this code or local traffic ordinances or to regulate, warn or guide traffic.''

Under these provisions the State Department of Public Works has the duty to post traffic signs and signals on highways ''under its jurisdiction''; local authorities ''in their respective jurisdictions'' have the duty to post such signs and signals on streets and highways. ■ Section 465 of the Vehicle Code and the foregoing sections of the Streets and Highways Code are *in pari materia* and must be construed together. (*Ebert* v. *State of California,* 33 Cal.2d 502, 509 [202 P.2d 1022]; *People* v. *Trieber,* 28 Cal.2d 657, 661 [171 P.2d 1]; *In re Porterfield,* 28 Cal.2d 91, 100 [168 P.2d 706,

167 A.L.R. 675] ; *Southern Pac. Co.* v. *Railroad Com.*, 13 Cal. 2d 89, 100 [87 P.2d 1055].) The State Department of Public Works has ''full possession and control'' of all state highways (Sts. & Hy. Code, § 100) including ''State highways within cities.'' (Sts. & Hy. Code, § 204.) Such highways are therefore ''under its jurisdiction'' within the meaning of section 465 of the Vehicle Code. The duty to place and maintain the traffic signs and signals required by that section is expressly placed on the State Department of Public Works. Moreover, it is that department only that determines the degree and type of maintenance including ''safety conveniences and devices'' for each state highway. (Sts. & Hy. Code, §§ 27, 100.) It follows that state highways are not within the jurisdiction of local authorities to control or maintain, and are therefore not ''in their respective jurisdictions'' under section 465 of the Vehicle Code.

To hold that a state highway, which the State Department of Public Works has ''full possession and control of,'' and for which that department determines the degree and type of maintenance, including safety conveniences and devices, is ''in [the] respective jurisdictions'' of local authorities would not only create a direct conflict between the two codes, but would lead to anomalous and unreasonable results. Both subdivisions (a) and (b) of section 465 provide that the respective agencies ''shall place and maintain'' the required traffic control devices. If two or more agencies had the same mandatory duty, confusion would result when they sought to discharge their duties over the same highway, and the uniformity sought to be achieved by the state highway system would be defeated. (See *Atlas Mixed Mortar Co.* v. *City of Burbank*, 202 Cal. 660, 663 [262 P. 334].) Moreover, the placement and maintenance of traffic signs and signals is only a part of the general duty to maintain streets and highways in a safe and usable condition. Whether or not there is need for warning signs or signals will frequently depend on what other steps may be taken to render the highway safe and usable. In the present case, for instance, posting a warning sign would be only one of several means that might be adopted to apprise motorists of the curve ahead. Proper maintenance might eliminate the danger altogether, so that no warning would be necessary. It would be unreasonable to conclude that the Legislature intended that the limited part of maintenance involving the placement and maintenance of traffic

signs and signals should be treated differently from the problem as a whole.

Plaintiffs contend, however, that the city had both the authority and the duty to correct the allegedly dangerous condition under the terms of a contract between the city and the Department of Public Works whereby the state agency delegated authority to the city. (See Sts. & Hy. Code, §§ 114, 116, 203.) The contract in question dealt with the allocation of gas tax funds and was a renewal of biennial agreements between the city and the state containing substantially the same terms dating back to 1934. It provided in substance that the city should perform general maintenance work on all state highways within the city limits with the exception of Route 156, here in question, and Route 205. General maintenance work on these routes was to be done by the state. Plaintiffs nevertheless contend that failure to give proper warning of the curve was the cause of the accident, and that the city should have installed the necessary warning signs or barricades between the curb line and right of way line of the highway, on the ground that responsibility for maintenance of this area was delegated to the city under the terms of a miscellaneous provision of the contract. That provision provided:

"The department will maintain the State highways from curb line to curb line only. There is hereby delegated to the city the maintenance of the areas between curb lines and right of way lines, except when operations by the department are being conducted thereon in connection with the construction or maintenance work between the curb lines."

The city contends, however, that this provision was not intended to apply to a mountain road lacking the usual curbs and sidewalks of the ordinary city street. It contends also that in referring to maintenance of the area beyond the curb line the parties had in mind such maintenance as might be necessary to make the area itself safe for use, not such maintenance within that area as might be necessary to make the roadway safe and usable.

It is clear when the contract is read in the light of the surrounding circumstances that the parties did not intend to apply the quoted provisions to the short section of Route 156 that cuts across an outlying corner of the city's territory. The parties did not interpret their agreement as imposing upon the city any duty with respect to the maintenance of Route 156. State engineers testified that the state did all the maintenance

work on the highway including the placing of warning signs and safety devices. The ''construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the courts.'' (*Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17].) The construction placed upon the contract by the parties in the present case is not only reasonable, but a contrary construction would be unreasonable. Route 156 is a mountain road, lacking the sidewalk area whose maintenance could reasonably be separated from that of the roadway. Moreover, less than one twentieth of the mountain section of the highway lies within the city limits. The only access to this section is from the road itself on either end, and the general character of the highway remains unchanged as it passes into and then out of the city limits. It would be unreasonable to conclude that the parties intended that the state maintain the whole of the highway up to the city limits, then only the pavement for the next fraction of a mile, and then resume maintenance of the whole, leaving to the city the responsibility for maintaining the borders of the road for the fraction of a mile in between.

Even if it is assumed, however, that under the terms of its contract the city was responsible for maintaining the area beyond the traveled portion of the highway, its duty of maintenance was defined and limited by the contract. The maintenance clause provided:

''Maintenance work shall be adequate to keep the roadway, structures, and facilities in the safe and usable condition to which they have been constructed or improved, and provision shall be made for constantly making needed repairs to preserve a smooth surface.

''Maintenance work shall be satisfactory to the department, and should the department at any time consider the maintenance of the State highway routes or any portion of the routes unsatisfactory and inadequate for the traffic needs and conditions thereon, and if the city does not correct the unsatisfactory condition after due notice from the department, the department may enter upon such State highway route and maintain such street with its own forces, and the cost will be defrayed from the ¼ cent gas tax allocated for expenditure upon State highways within the city.''

Under this provision the city's duty of maintenance was

limited to keeping "the roadway, structures, and facilities in the safe and usable condition to which they have been constructed or improved." It was under no duty and it lacked authority to add additional structures and facilities. The department of public works retained the authority under the contract to determine when maintenance beyond keeping the highway in the condition to which it had been constructed or improved was necessary to make the routes satisfactory and adequate for the traffic needs and conditions thereon. There is no evidence that Route 156 was not maintained in the condition to which it was constructed or improved at the time the city first undertook maintenance duties under its contract. Plaintiffs contend, on the contrary, that the curve was dangerous and defective because additional warnings were not provided and that the city is responsible because, after having knowledge of the dangerous condition, it failed to provide them. Under its contract, however, it had no authority to do so.

Since the judgment must be reversed no purpose would be served by considering the appeal from the order denying defendant's motion to vacate the judgment. Accordingly, the appeal from the order denying the motion to vacate the judgment is dismissed.

The judgment is reversed.

Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority hold: (1) That under the law the state has the *exclusive* right to maintain traffic warning devices along state highways and therefore the city having no power to maintain them cannot be held responsible for its failure to do so. (2) That the city did not acquire such authority under its contract with the state. I cannot agree with either proposition.

As to the first proposition, there are two answers. *First,* the statutes correctly construed, confer upon both the city and the state the right to maintain traffic warning signs. The majority rely upon provisions of the Streets and Highways Code, which state that the state shall have full "possession and control" of all state highways within or without cities and shall maintain them, which includes safety devices. (Sts. & Hy. Code, §§ 27, 100, 204.) Those provisions do not necessarily mean that the state's authority is exclusive, and at least, as to *warning* devices, must be read in connection with

the provisions of the *Vehicle Code.* Section 465(a) of the latter code first states that the state shall maintain such appropriate signs as may be necessary to warn traffic. Subdivision (b) then reads: "*Local authorities* in their respective jurisdictions *shall place and maintain or cause to be placed* and maintained such traffic *signs* and, subject to the provisions of section 466, such stop signs, semaphores and control devices upon streets and highways as may be necessary to indicate and to carry out the provisions of this code or local traffic ordinances *or to* regulate, *warn* or guide *traffic.*" (Emphasis added.) The exception referred to (§ 466) deals only with the erection by a city of traffic *control* signals such as a stop sign or semaphore. It will be noted that the authority of· a city extends to "streets and highways" within its boundaries. "'Street' or 'highway' is a way or place of *whatever nature,* publicly maintained and open to the use of the public for purposes of vehicular travel." (Emphasis added.) (Veh. Code, § 81.) Thus, where the two provisions are construed together, (Sts. & Hy. Code, and Veh. Code, *supra*) that is, the provisions for state and local maintenance of warning devices, both the state and city are clearly given authority to maintain such signs. Indeed the provisions of the Vehicle Code are more appropriately applicable, for they expressly deal with *traffic* problems and the safety precautions inherent therein, rather than general supervision over state highways.

*Second,* it is clear that the obligation and duty rested upon the city to request the state to erect signs, or at least, to authorize the city to do so. Having failed to do so, it is liable. That is the square holding in *Shea* v. *City of San Bernardino,* 7 Cal.2d 688 [62 P.2d 365]. There the dangerous condition existed in a street where it crossed railroad tracks. Although the Railroad Commission had exclusive jurisdiction over such crossings, the court held the city liable on *two distinct* theories. One, that the city should have placed a warning sign on its street at the approach to the crossing, and on the other, it stated: "In giving consideration to appellant's contention that the city was powerless to remedy the defect the above-mentioned hypothesis will be assumed to be correct. Nevertheless, the contention is not impressive. It must be remembered that the improvement of streets within the boundaries of a city is an affair in which the city is vitally interested. The governing board and officers of the municipality in dealing with such an affair *may not complacently declare that they*

*were powerless over a long period of years to take any steps to remedy a defective and dangerous condition that existed in one of the principal streets of the city.* If the railroad commission had the exclusive jurisdiction to order the north track to be lowered *it was the duty of the city at some time during the six-year period to call upon the railroad commission to order the rail to be lowered and thus to remove an obviously dangerous condition in the street.*" (Emphasis added.) (*Shea* v. *City of San Bernardino, supra,* 692.) It follows therefore that the city here is liable under the rule in the Shea case.

On the second proposition it is clear that the contract by its express terms provides that the city has control over and the duty of maintaining the highway here involved insofar as the untravelled portion is concerned. It states: "The (state) will maintain the State highways from curb line to curb line *only.*" The warning devices here involved would have been outside the curb line. It is indeed a technical distinction to say, as do the majority here, that that means the city need only keep the area outside the curbs safe for such use as may be made of that area alone without regard to uses which may be made of the highway between the curbs. The warning signs are necessarily within the area under the city's jurisdiction. Therefore, so are the placing of such warning signs. The word maintain as used therein means, as the majority assert in the forepart of its opinion, the maintenance of safety devices. The expression is from curb *line* to curb *line,* thus indicating that the contract includes highways where there is not in fact a curb. From curb line to curb line means the travelled portion of the highway. (*In re Ives,* 155 App.Div. 670 [140 N.Y.S. 694].) If warning devices are required on the area of the right of way outside the curbs for the purpose of warning against some defect therein, it is not reasonable to suppose that the city would have exclusive control of such devices, while the state would have exclusive jurisdiction over the same area for persons staying on the travelled portion of the highway. It is obvious that the city would control said area for the benefit of those using any portion of the highway. Indeed the instant case is typical. The absent warning device would be a white fence along the edge of the right of way which would serve as a safety factor for persons using the travelled or untravelled portion of the highway. The testimony of state highway engineers that the state did all the placing of warning devices does not mean that the state had the exclusive right to do so. The respective duties and responsi-

bilities of the state and city must be ascertained by reading the code provisions and contract applicable thereto. It is clear from these provisions that the duty rested upon the city to maintain the absent warning devices, and its liability for the accident here involved was, therefore, established.

This case was tried before a most able and experienced trial judge and a jury. Evidence that the accident was the result of a dangerous and defective condition of the highway is almost free from conflict. The judgment in favor of plaintiffs was affirmed by a unanimous decision of the District Court of Appeal (95 A.C.A. 438 [213 P.2d 83]). That decision contains a clear and correct statement of the facts and the law applicable thereto. I adopt it as a part of this dissent. The opinion of the District Court of Appeal prepared by Mr. Presiding Justice Minor Moore and concurred in by Justices Emmet Wilson and Marshall McComb is as follows:

"Appeals from six judgments on verdicts against appellant for its negligence in failing to maintain a portion of a state highway resulting in the deaths of six persons, and from the order denying appellant's motion to set aside such judgments.

"In the far reaches of the sprawling city of Los Angeles through the mountainous region that lies to the west of that metropolis, a state highway—Route 156—lies along a circuitous canyon road. While it extends in a generally westward direction through Topanga Canyon from Ventura Boulevard* to the Pacific Ocean about 20 miles, only .86 of a mile thereof lies within the city's corporate limits. Along this highway an automobile with six occupants proceeded on the night of September 4, 1943. At a curve in the road the vehicle did not follow the pavement, but, instead, continued on a straight course and plunged 150 feet into the canyon below. No one that viewed the tragedy survived to relate who was driving, the rate of speed of travel or the direction in which the car was headed. The only memento of the dire event was the burned wreckage in the sullen depths below. From the evidences of the manner in which the machine left the pavement and tumbled into the gorge and from the applicable presumptions, it was established that by reason of the city's negligence in failing to maintain warning devices and barriers along the right of way of Route 156 the decedent motorists rushed to their deaths.

"The road was surfaced with asphaltic concrete pavement

"*A principal state highway running to the north and south.

varying in width from 20 to 24 feet with shoulders of rock and oil or decomposed granite from 6 to 8 feet in width. At the scene of the accident there were no barriers, posts, barricades, blinkers, cats-eyes or other warning devices. Neither was there a zigzag line painted on the pavement at the approach to the curve. A center stripe of broken white lines had been painted on the road approximately three months earlier. The average life of such a stripe is 14 or 15 months. The grade was approximately 5.5 per cent and the curve had a radius of approximately 150 feet with similar curves above and below the point of accident. Standard signs such as 'Winding Road' and 'Slow' to a designated safe speed had been installed at points above and below the locus of the accident. There was some evidence that the road was without a dimout area proclaimed by the Western Defense Command.

"Actions by surviving relatives against appellant, sometimes herein referred to as the city, and the State of California were commenced on the theory that the highway had been defectively designed and that the city and the state had permitted dangerous and defective conditions to exist which caused the accident. After the court at Sacramento held that the amended complaint did not state a cause of action against the state, the action was dismissed as to that defendant. Thereupon, the cause was transferred to the court below in which, after trial, verdicts aggregating $110,000 were entered against the city.

"As grounds for reversal the city contends:

"(1) The boulevard involved is a state highway and under the exclusive control of the state and therefore the city cannot be liable for neglect of it.

"(2) Since the danger complained of relates to the construction and design of the highway, the agreement to maintain cannot be held to apply to the Topanga Canyon Road.

"(3) Not only was the highway not in a dangerous or defective condition but it does not appear that the condition of the highway was a proximate cause of the accident.

"(4) The trial having been commenced in Sacramento County, its transfer to Los Angeles County for the purpose of resuming and finishing the proceeding was prejudical error; the Superior Court of Los Angeles County had no jurisdiction to try the cases and enter judgments.

"CITY LIABLE UNDER GENERAL LAW

"The instant action was instituted under the 'Public Liability Act' of 1923 (Stats. 1923, p. 675; 2 Deering's Gen.

Laws, Act 5619.) Section 2 provides '. . . municipalities
. . . shall be liable for injuries . . . resulting from the dangerous or defective condition of public streets, highways . . .
*in all cases* where the governing or managing board of such
. . . municipality . . . *having authority to remedy such condition,* had knowledge or notice of the defective or dangerous
condition . . . and failed or neglected . . . to remedy such
condition or failed and neglected . . . to take such action
as may be reasonably necessary to protect the public. . . .'
(Emphasis added.)

"Under the act liability is imposed upon municipalities
for injuries to persons or property resulting from dangerous
or defective conditions of public streets and highways when
the city has notice of the defect and fails to remedy it.
(*Watson* v. *Alameda,* 219 Cal. 331, 333 [26 P.2d 286];
*Arellano* v. *City of Burbank,* 13 Cal.2d 248, 254 [89 P.2d 113].)
The general rule is that liability exists not only for defects
arising after construction but also for improper construction
in the first instance. (*George* v. *Los Angeles,* 11 Cal.2d 303,
308 [79 P.2d 723]; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,*
28 Cal.App.2d 215, 219 [82 P.2d 216].) In order to escape
liability the city must either eliminate the dangerous condition or protect the public by adequate warning, and the sufficiency of such warning is a question of fact in each case.
(*Bigelow* v. *Ontario,* 37 Cal.App.2d 198, 205 [99 P.2d 298];
*Barsoom* v. *Reedly,* 38 Cal.App.2d 413, 419 [101 P.2d 743].)

"The jury by its verdict has impliedly found that a dangerous and defective condition existed, and that appellant had
notice thereof but failed to remedy it. Under the act there
remains only one other condition precedent to the imposition
of liability on the city. The case must be one in which
the municipality has 'authority to remedy such condition.'
Appellant argues that it did not exercise control over the highway here involved, and therefore is not liable under the act.
The act does not require that a municipality *exercise* control
over a highway; rather, it imposes liability where the municipality has 'authority to remedy the condition' and fails
to do so. The language of the Act of 1923 is sufficient authority for the city under the facts to remove the peril. The
authorities relied upon by appellant are not pertinent on
this point. They (*Watson* v. *City of Alameda,* 219 Cal. 331
[26 P.2d 286]; *Perry* v. *City of San Diego,* 80 Cal.App.2d 166
[181 P.2d 98], and *Sinclair* v. *City of Pasadena,* 21 Cal.App.
2d 720 [70 P.2d 241]) relate only to the question of the suffi-

ciency of the notice to the cities involved that a dangerous and defective condition existed. In the instant case the sufficiency of the notice is attested by the prior accidents at the same place. (*Bigelow* v. *Ontario, supra,* 204; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal.App.2d 215, 219 [82 P. 2d 216].) *Galiano* v. *Pacific Gas & Electric Co.,* 20 Cal.App. 2d 534 [67 P.2d 388], is not applicable. It concerns the liability of an abutting property owner, and not that of a municipality.

"Appellant's contention that a municipality is not liable for dangerous and defective conditions over which it does not exercise control is not supported. If the failure to exercise control were sufficient to avoid liability the whole purport and intent of the Public Liability Act of 1923 could be obviated simply by inertia. The cases cited by appellant are not in point because the applicable statutes specifically relieved the municipalities of liability or because they were instituted against parties other than municipalities. Notwithstanding the Act of 1923 and the authorities last cited, appellant contends that it 'has no supervision or control over route 156 within its city limits.' In support of such contention it cites a number of authorities which on close inspection fail of their purpose. In *Southern California Roads Co.* v. *McGuire,* 2 Cal.2d 115 [39 P.2d 412], a proceeding in mandamus, the city had by contract with the state undertaken the construction and improvement of a state highway within the corporate limits. After such contract had been executed the petitioner agreed by a writing to do the work. This document fulfilled the requirements of the city charter but did not comply with state law. The court held that such a contract must conform with state law. No question of tort liability was raised in the case. Neither the proposition there enunciated nor the facts recited can aid in the solution of the question at bar. Merely because the state retains supervisorial powers over city subcontracts, the city is not thereby relieved of obligations imposed upon it by general law. In the cited case the entire work was to be done by the city. In the instant case, all work was to be done by the state with the exception of that done from the curb line to the property line. In the McGuire case, supra, the city took the position that it was required to comply with state law. In the instant case, the city takes the position that the general laws of the state did not impose upon it any obligation to erect barriers or warning devices in the area allocated to it by the contract. These contentions are not only inconsistent but the argument of the city finds no support in the McGuire

case. In *Stadelmann* v. *City of New York,* 126 App.Div. 352 [110 N.Y.S. 682], the court held the city not liable for injuries sustained by a pedestrian. There is no showing that the road there involved was a state highway. The case sheds no light upon the instant issues. The same is true of *Trotter* v. *Town of Glenmora,* (La.App.) 2 So.2d 510, which follows the Stadelmann decision.

"THE CITY IS LIABLE UNDER THE CONTRACT

"For the purpose of improving and maintaining certain state highways, the state determined about August, 1943, to effect certain projects. In that month the city and the state entered into a written agreement pertaining to the maintenance of certain state highways within the city, including Route 156. In compliance with section 203 of the Streets and Highways Code, the agreement provided for the expenditure of $7,250 by the Department of Public Works.* 'The portions of state highway routes to be maintained under project 97(b) are described as follows: "Route 156, Topanga Canyon Road, from city limits about 2.70 miles north of junction with Route 60 to north city limits near Fernwood Park; a length of approximately 0.86 mile for this portion."' The Department of Public Works did not delegate authority or jurisdiction over Route 156 in its entirety to the city. The only specific reference to that highway comes under the heading: '(b) Work by the department.'

" 'Article VI, Miscellaneous Provisions' of the agreement provides: 'In the event the work of maintaining the state highway routes within the city is being done by the department, the approval of the department shall be secured before any encroachment on the surface or any cut, excavations or openings in the vehicular roadway are permitted *The department will maintain the State highways from curb line*

"*The fund expended on the construction and maintenance of highways is designated 'Motor Vehicle Fuel Fund.' It is raised by levies of 6 cents per gallon on all gasoline fuel distributed in the state. (Rev. & Tax. Code, §§ 7351, 8651.) The state treasurer pays it into the State Highway Fund. (Ibid., §§ 8357, 9302.) Such fund must be expended for the maintenance of state highways. (Sts. & Hy. Code, § 188.) The Department of Public Works shall expend an amount not less than the revenue derived from one-fourth cent per gallon tax on such fuel for the improvement and maintenance of state highways within cities. (Ibid., § 203.) A municipality may contract with the state for the performance of the work within its corporate limits, (ibid., § 202) and in respect to the proportion of the expenses of such improvement and maintenance of a highway to be borne by the respective parties, and such highway may be located in whole or in part within the limits of the contracting city. (Ibid., § 130.)

*to curb line only. There is hereby delegated to the city the maintenance of the areas between curb lines and right of way lines . . .'*

"Appellant advances the proposition that it is not liable for a dangerous condition of property over which it does not exercise control. If by any chance the city is not liable under the Public Liability Act and the decisions heretofore cited, it is liable beyond a peradventure by virtue of its agreement for detriment caused by its neglect to maintain its streets in a reasonably safe condition. Under its contract with the state the liability of appellant is accentuated. In support of its thesis, the city cites *Griffith* v. *Town of Berlin,* 130 Conn. 84 [32 A.2d 56]; *Gardner* v. *City of Covington,* 86 Ind.App. 229 [156 N.E. 830]; *Brunacci* v. *Plains Township,* 315 Pa. 391 [173 A. 329]; *Barnett* v. *City of Opelousas,* (La.App.) 13 So.2d 788; *Glover* v. *Town of Ponchatoula,* (La.App.) 17 So.2d 44; *Gabbert* v. *City of Brownwood,* (Tex.Civ.App.) 176 S.W.2d 344. In no respect do these authorities apply. In none of them was there an agreement between the city and the Department of Public Works obligating the municipality to maintain a part of the highway in question.

"While 'full control and possession of all state highways is vested in the State Department of Public Works' (Sts. & Hy. Code, § 100) yet the Department of State Highways may delegate to any city the department's powers, duties and authority as to any state highway or any part thereof. (Ibid, § 676; *Southern California Roads Co.* v. *McGuire,* 2 Cal.2d 115, 123 [39 P.2d 412].)

"Appellant contends that the italicized portions of its contract pertain to the maintenance of sidewalks and parking strips along those streets which are improved and that they can have no reference to a mountain road such as that in Topanga Canyon 'where the only portion of the right of way improved for travel and so used is the roadway designed and maintained by the State for vehicular travel.' But the unambiguous language of the contract clearly gives to the city the right and obligation to maintain those portions of the highway extending outward from the curb line to the right of way lines and by its contract the city was in that area obligated to do whatever was essential to make the highway reasonably safe for travel at all times. That the trial court adopted such thesis is evidenced by the fact that it instructed the jury that the pleadings admitted that by the agreement the city was authorized to maintain the areas

between curb lines and right of way lines. This instruction was correct since appellant had attached a copy of the agreement to its answer as a part thereof. Having admitted the execution and validity of its own contract appellant is in no position to deny the significance of its plain provisions.

"Thus by contract not only did the city acquire the right to erect warning signs and barriers upon those portions of the highway outside the paved road but thereby its duties under the Public Liability Act were enlarged. There is no reasonable basis for appellant's contention that it lacked power to do the acts essential to the maintenance of the .86 mile on Route 156 as a safe highway. The fund under control of the Highway Commission was available in sufficient amount to make it safe. By the contract the city was required to 'maintain the highway from curb line to the right of way line.' And even though the language of the contract did not require the city to perform any work upon the paved portion, a reasonable construction would require appellant either to paint zigzag white stripes on the pavement at approaches to curves or to keep barriers outside the pavement wherever a dangerous condition existed so near the pavement as to be a peril, or to post warning signs. Having failed to do those things, even assuming appellant's contention that it lacked power or authorization to do so, it was nevertheless not relieved of the responsibility to warn persons lawfully using the highway that a dangerous condition existed. (*Shea* v. *City of San Bernardino,* 7 Cal.2d 688, 693 [62 P.2d 365]; *Rose* v. *County of Orange,* 94 Cal.App.2d 688, 691 [211 P.2d 45].) A municipality may not ignore a hazard to travelers within its borders on the ground that it lacks jurisdiction to act. (*Shea* v. *City of San Bernardino, supra,* 692, 693.) There was no evidence adduced at the trial that the city had urged the department to remedy the condition at the place of accident. Having failed to take action itself under a contract which empowered it to act, and having failed to urge action on the part of the department which appellant contends had the sole power to act, the city cannot now assert that it was not delinquent in its duty to the public.

"MAINTENANCE

"It is next argued that the posting of adequate warning signs and erection of guards and barriers is not a matter of maintenance, but of construction and therefore the agreement did not require the city to erect such devices. The answer to this contention is found in section 27 of the Streets

and Highways Code: '. . .'"maintenance" includes . . . [t]he necessary provision for special safety conveniences and devices.'

## "OTHER ISSUES

"Over objection evidence was admitted to show efforts on the part of the city to induce the state to construct projects on other portions of Route 156 out of the available fund. Appellant contends that its admission was prejudicially erroneous. The record discloses that the evidence was admitted to show that such a procedure was available to the city to procure the improvement of the portion of Route 156 here involved. That the city was interested in the condition of other parts of the highway and failed to take an interest in that portion within its own boundaries was proper evidence to enable the jury to determine whether the city had been delinquent in its duty to the public. Since 'the improvement of streets within the boundaries of a city is an affair in which the city is vitally interested,' (*Shea* v. *City of San Bernardino, supra,* p. 693) its failure to take an interest therein is best demonstrated by its interest elsewhere. No valid reason appears why the city could not have requested authority from the department to act and have requested its share of the gasoline tax fund with which to erect such guard rails and warning devices as would have removed the death trap which took the lives of the decedents. Even if the evidence was inadmissible, it is not shown how it proved prejudicial to appellant's cause, and without prejudice, the error, if any, is not ground for reversal. (Const., art. VI, § 4½.)

## "DAMAGES NOT EXCESSIVE

"The damages awarded were not excessive. Ottie Gillespie was awarded $20,000 for the death of her youngest son, her sole support. Ila and Patrick Gillespie, the widow and minor son of Doyle Gillespie, were awarded $30,000 for the loss of the husband and father. The value of the proof of domestic infelicity in their home was a matter for the jury's appraisal as well as all other factual issues. The husband earned in excess of $3,000 per annum while the expectancy of Ila exceeded 43 years and the minority of Patrick exceeded 18 years. The joint award to them was not excessive. (See *Sherman* v. *Southern Pacific Co.,* 34 Cal.App.2d 490 [93 P.2d 812]; *Weiand* v. *Southern Pacific Co.,* 34 Cal.App.2d 500 [93 P.2d 1023]; *McDonnell* v. *Southern Pacific Co.,* 17 Cal. App.2d 432 [62 P.2d 201].) Petra Perez Oveso, Evelyn

Russell, Charles Bittner and Mr. and Mrs. Smith were awarded $15,000 respectively for the deaths of their minor children. In the case of each of these plaintiffs, ample proof was adduced showing the contributions by the decedent to his parents and his loyalty to and affection for them. On these matters the findings of the jury in the absence of error are conclusive. *Hunton* v. *California Portland etc. Co.*, 64 Cal.App.2d 876 [149 P.2d 471], cited by appellant on the excessiveness of the verdicts is not in point. The father was a young and successful businessman. The possibility that the deceased son would ever have supported him was too remote.

"A large award for the loss of a loved one does not in and of itself establish that it is the result of prejudice or passion. Compensation for loss must be fixed in view of the purchasing power of the dollar at the time of the loss and not by its power of 20 years ago. Today the dollar's value in purchasing power is not to exceed 60 per cent of its value in 1940. The value of an award is not to be 'estimated in the numerical quantum of recompense but in its comparative ability to furnish the necessities of life.' (*O'Meara* v. *Haiden*, 204 Cal. 354, 366 [268 P. 334, 60 A.L.R. 1381]; *Butler* v. *Allen*, 73 Cal. App.2d 866, 867, 870 [167 P.2d 488]; *Brown* v. *Boehm*, 78 Cal.App.2d 595, 603 [178 P.2d 49].) Not only is loss in dollars and cents to be considered in fixing damages, but also loss of comfort, society and protection. Therefore, no yardstick as to amount can be utilized. (*Holder* v. *Key System*, 88 Cal.App.2d 925, 940 [200 P.2d 98].) In the instant case it cannot be said that the compensation awarded for the loss of minor child or husband was unduly generous.

## "THE COURT HAD JURISDICTION

"Appellant's final contention is that the Superior Court of Los Angeles County was without jurisdiction to try the cause. The action was originally filed in that county but was removed to Sacramento County on motion of the state where it was stipulated between plaintiffs and the state: '. . . that since said defendant desires to present to the above-entitled court the defendant's contention that the complaint fails to state a cause of action, and since both parties desire to determine said point without inconveniencing a large number of witnesses by preparing at this time for the trial of the entire cause, it may be deemed that the first witness has been sworn and that the said defendant has seasonably objected to the introduction of any testimony whatever on

the grounds that the complaint fails to state a cause of action against the defendant State of California, and that thereupon the matter may be argued and submitted to the court.' The objection of the state was sustained and a judgment of dismissal as to the state rendered. The cause was then transferred by the court to Los Angeles County on the ground of convenience of witnesses under subdivision 3 of section 397 of the Code of Civil Procedure. Appellant asserts that the trial had actually commenced in Sacramento County and that it was therefore improperly discontinued and transferred to another county.

"It is the prevalent practice to rule upon a general demurrer before receiving evidence of the allegations. Upon the state's objection to any evidence the issue of law was raised as to the sufficiency of the complaint. The Sacramento court did not consider the merits of respondents' cause of action against appellant but simply determined as a matter of law that the facts alleged in the second amended complaint were insufficient to constitute a cause of action against the state. That ruling having adjudicated with finality respondents' claims against the state, it was correct practice to deal with the matter as though respondents had filed the action at first in the Sacramento court against the city only. No pertinent authority is cited for the proposition that the court could not thereafter transfer the cause to another county for the convenience of witnesses. What else could the Sacramento court have done since the only interested parties remaining in the action were residents of Los Angeles County and their witnesses resided there? To have denied the demand for removal would have been an injustice to all the litigants.

"All the issues presented by this appeal were duly considered by the trial judge during the course of the trial. The question of jurisdiction was considered on the hearing of appellant's motion to set aside the judgments. No prejudicial error appears with respect to any judgment or in the order denying appellant's motion to set aside the judgments.

"The judgments and the orders are affirmed."

In view of the foregoing, I would affirm the judgments.

Schauer, J., concurred.

Respondents' petition for a rehearing was denied January 25, 1951. Gibson, C. J., Carter, J., and Schauer, J., voted for a rehearing.